Kenneth J. Catanzarite (SBN 113750)
kcatanzarite@catanzarite.com
Tim James O'Keefe (SBN 290175)
tokeefe@catanzarite.com
CATANZARITE LAW CORPORATION
2331 West Lincoln Avenue
Anaheim, California 92801
Tel: (714) 520-5544
Fax: (714) 520-0680

Todd S. Frankenthal, Esq. (SBN 350451)
LAW OFFICES OF TODD S. FRANKENTHAL
LOCAL ATTORNEY
One East Broward Boulevard, Suite 700
Fort Lauderdale, FL 33301
(954) 356-0464
TSFLaw01@bellsouth.net

Attorneys for Plaintiffs and Creditors

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| In Re:<br>In Re: Daymark Realty Advisors, Inc. Case Nos.<br>In Re: Daymark Residential Management, Inc.<br>In Re: Daymark Properties Realty, Inc.<br>　　　　　　　　　　Debtors. | Chapter 11<br>18-23750-RBR,<br>18-23751-RBR &<br>18-23752-RBR<br>(Substantively Consolidated)<br><br>Adv. Case No.: _____ |
| RICHARD CARLSON as beneficiary of GREIT LIQUIDATING TRUST, a terminated trust on behalf of himself and all others similarly situated;<br><br>　　　　Plaintiffs,<br>v.<br><br>DAYMARK REALTY ADVISORS, INC., a Delaware corporation; DAYMARK PROPERTIES REALTY, INC. f.k.a. Triple Net Property Realty, Inc., a California corporation; and Does 1-40,<br><br>　　　　Defendants. | **ADVERSARY CLASS ACTION COMPLAINT FOR:**<br><br>**1. Breach of Fiduciary Duty**<br>**2. Nondischargeabilty Against the Debtors DRA AND DPR Pursuant to 11 USC § 523(a)(2)**<br>**3. Nondischargeabilty Against the Debtors DRA AND DPR Pursuant to 11 USC § 523(a)(4)**<br>**4. Nondischargeabilty Against the Debtors DRA AND DPR Pursuant to 11 USC § 523(a)(6)**<br>**5. Breach of Congress Center Property PMA Contract**<br>**6. Tortious Interference with Congress Center PMA Contract**<br>**7. Intentional Interference with Prospective Economic Advantage**<br>**8. Negligence**<br><br>**JURY TRIAL DEMANDED** |

---

**Class Action Adversary Complaint**

1

# TABLE OF CONTENTS

2

Page No.

3    I.     NATURE OF ACTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1.

4    II.    JURISDICTION, VENUE AND JURY TRIAL. . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2.

5    III.   THE PARTIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3.

6           A.    The Plaintiffs. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3.

7           B.    Defendants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3.

8           C.    The Doe Defendants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6.

9    IV.    NON-PARTIES DEFINED FOR CONTEXT IN THIS ACTION. . . . . . . . . . . . . . . .  6.

10   V.     CLASS ACTION ALLEGATIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9.

11   VI.    CAUSES OF ACTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13.

12   FIRST CAUSE OF ACTION
     BREACH OF FIDUCIARY DUTY
13   Against All Defendants and Does 1-40. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13.

14              DELAYED DISCOVERY AND ESTOPPEL AGAINST DEFENDANTS
                TO ASSERT STATUTE OF LIMITATIONS DEFENSES. . . . . . . . . . . . . . .  31.
15
                THE NEED FOR A CONSTRUCTIVE TRUST. . . . . . . . . . . . . . . . . . . . .  34.
16
                THE NEED FOR AN ACCOUNTING. . . . . . . . . . . . . . . . . . . . . . . . . . . .  34.
17
18   SECOND CAUSE OF ACTION
     NONDISCHARGEABILTY AGAINST THE DEBTORS DRA AND DPR
     PURSUANT TO 11 USC § 523(a)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  34.
19
20   THIRD CAUSE OF ACTION
     NONDISCHARGEABILTY AGAINST THE DEBTORS DRA AND DPR
     PURSUANT TO 11 USC § 523(a)(4). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  35.
21
22   FOURTH CAUSE OF ACTION
     NONDISCHARGEABILTY AGAINST THE DEBTORS DRA AND DPR
     PURSUANT TO 11 USC § 523(a)(6). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  36.
23
24   FIFTH CAUSE OF ACTION
     BREACH OF CONGRESS CENTER PROPERTY PMA CONTRACT
     Against DPR and Does 16-20. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  37.
25
26   SIXTH CAUSE OF ACTION
     TORTIOUS INTERFERENCE WITH CONGRESS CENTER PMA CONTRACT
     Against all Defendants and Does 1-40, Except DPR. . . . . . . . . . . . . . . . . . . . . . . .  40.
27

28   //

**Class Action Adversary Complaint**

SEVENTH CAUSE OF ACTION
INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC
ADVANTAGE
Against DRA, DPR and Does 1-40. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41.

EIGHTH CAUSE OF ACTION
NEGLIGENCE
Against all DRA, DPR and Does 1-40.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42.

VII.      PRAYER FOR RELIEF.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42.

**Class Action Adversary Complaint**

## CLASS ACTION ADVERSARY COMPLAINT

Plaintiffs, on behalf of himself/herself/itself/themselves and all others similarly situated, complain and allege as follows.

### I.

### NATURE OF ACTION

1.     This complaint is on behalf of a putative class of 13,858 "Beneficiaries" who invested an average of $31,561 per person between July 22, 2002 through December 31, 2004 to acquire 43,865,000 shares of G REIT, Inc. common stock at a price of $10.00 per share pursuant to a registration statement on Form S-11/A under the Securities Act resulting in the corporation's receipt of gross proceeds of $437,315,000. The Beneficiaries as members of the class are now holders of "Beneficial Interests" in the terminated GREIT LIQUIDATING TRUST ("TRUST").

2.     Plaintiffs allege that the Defendants, as defined below, exercised his/their powers individually and collectively, and among other things, breached fiduciary duties, acted in bad faith and not in the best interests of the Beneficiaries causing loss, injury and damage. While Plaintiffs dispute that other than ordinary standards of care apply to the conduct of the Defendants described herein, it/he/they are nevertheless also liable for their grossly negligent actions, grossly negligent failure to act, their fraud and/or willful misconduct as described herein.

3.     Plaintiffs allege the Defendants named herein have committed and then concealed serial breaches of fiduciary duty, or aided and abetted such wrongful conduct directed against the terminated TRUST and Beneficiaries, including without limitation, concealed the material cause of loan defaults against the TRUST's Congress Center Property and the "for cause" right to cancel management contracts without penalty as described below, and facilitated the use of TRUST property to indirectly fund a self-interested and adverse to Beneficiaries, and purchase of TRUST properties at known to be below market prices resulting in avoidable losses subject to proof at the time of trial.

4.     Plaintiffs did not discover the misconduct described herein until December 2017 after they engaged counsel to investigate why a purported $12,000,000 promissory note had not been paid at which time it was first learned the information provided by the purported trustees of

1.

1  TRUST had misrepresented the true facts, misled the Beneficiaries and concealed the misconduct

2  described herein.

3       5.     Plaintiffs allege that there are 43,865,000 "Units" of the TRUST outstanding, held

4  collectively by the 13,858 Beneficiaries and that the defendants will allege that no amount is due

5  to Beneficiaries. However, Plaintiffs allege subject to proof at the time of trial, that the amounts

6  due to the Beneficiaries, excluding punitive and exemplary damages that may be awarded, is

7  $100,000,000 collectively, $2.27 per Unit.

8       6.     As a result of defendants' wrongful acts and/or the aiding and abetting thereof,

9  Defendants, Debtors DAYMARK REALTY ADVISORS, INC. and DAYMARK PROPERTIES

10  REALTY, INC.'s debt due to the Beneficiaries is Nondischargeable Pursuant to 11 U.S.C. § 523

11  and Plaintiffs are entitled to damages according to proof at the time of trial.

12  **II.**

13  **JURISDICTION, VENUE AND JURY TRIAL**

14       7.     This Court has jurisdiction over the subject matter of this adversary proceeding

15  pursuant to the provisions of 28 U.S.C. §1334. This adversary proceeding relates to the Chapter

16  11 cases of 18-23750-RBR and 18-23752-RBR, jointly administered with 18-23751-RBR, under

17  Chapter 11 of Title 11 of the United States Code now pending in this court to determine

18  dischargeablity of a debt and related claims. This matter is a "core proceeding" pursuant to 28

19  U.S.C. §157.

20       8.     Plaintiffs do not waive their position that venue is proper, pursuant to the

21  provisions of 28 U.S.C. §1409 in the Central District of California, as a result of applicable

22  forum selection and arbitration clauses. In the event that the Court rules against Plaintiffs and

23  finds venue is proper in the Southern District of Florida then venue is proper in this court.

24  Moreover, Plaintiffs commenced claims stated in this action in the Orange County Superior

25  Court, State of California as Case No. Case No. 30-2018-00982195-CU-MC-CXC,

26  Assigned for All Purposes to the Hon. Randall J. Sherman, Dept. CX-105 on March 23, 2018,

27  thereby tolling any applicable statute of limitations.

28  //

2.
**Class Action Adversary Complaint**

9. Class actions are permitted in the Bankruptcy Court under Federal Rules of Civil Procedure Rule 23 and Federal Rules of Bankruptcy Procedure Rule 7023.

10. Plaintiffs demand a jury trial on all issues triable by jury in this action. At this time, Plaintiffs do not consent to a jury trial before the bankruptcy court.

### III.

### THE PARTIES

**A.    The Plaintiffs**

11. Plaintiff RICHARD CARLSON ("CARLSON") is an individual and resident of the State of California and a "Beneficiary" holding "Units" of the terminated GREIT LIQUIDATING TRUST ("TRUST"), organized on January 22, 2008, as a liquidating trust pursuant to a plan of liquidation of G REIT, Inc. approved by the shareholders in February 2006, which had been a corporation organized on December 18, 2001 under the laws of the Commonwealth of Virginia and reincorporated on September 27, 2004 in the State of Maryland, and qualified and elected to be taxed as a real estate investment trust, or "REIT", under the Internal Revenue Code of 1986, as amended.

12. References herein to "Plaintiffs" shall include CARLSON unless otherwise mentioned, individually and in a representative capacity on behalf of the proposed Class of Beneficiaries of the TRUST.

**B.    Defendants**

13. Defendant and Debtor DAYMARK REALTY ADVISORS, INC. ("DRA") was formed November 7, 2010, by Grubb & Ellis Company ("Grubb") to acquire NNNRA, as described below, and all of its subsidiaries including co-debtors in these jointly administered cases DPR, defined below, and Daymark Residential Management, Inc. ("DRM").

    a. Until 2013 DRA was the parent of and the alter ego of DPR, NNNRA, NNNRI, DRM and other affiliates. Post 2013 DRA was the alter ego of Mikles who through various entity instrumentalities and foreign trusts organized in the Cook Islands.

//

**Class Action Adversary Complaint**

b.    Defendants Mikles and Locoh, as described below, on and after August 2011, became the owners of DRA via an acquisition of its stock through their instrumentality IUC-SOV, LLC a Delaware limited liability company.

c.    IUC-SOV, LLC, as if late 2012, is owned 100% by SOV-Daymark, LLC.

d.    SOV-Daymark, LLC is owned 100% by SCRE Holdings of NV, LLC.

e.    SCRE Holdings of NV, LLC is owned 100% by Mikles.

f.    DRA and its subsidiaries DPR and NNNRI, as described below, are alter egos of one another as of the latest August 2011 because DRA and all of its subsidiaries:

    i.    Prepared consolidated financial statements without regard to whose assets and liabilities belonged to who;

    ii.    Commingled assets without regard to ownership or right to ownership as a result of funds provided and/or debts assumed;

    iii.    Each and all were insolvent on a net worth and inability to pay debts as they came due basis;

    iv.    Each as a result of insolvency were in breach of agreements by which fees were being received and which were subject to immediate "for cause" termination if disclosed was required but which was concealed;

    v.    Each of the asset and property management agreements were also subject to "for cause" termination on the grounds of "(a) gross negligence or fraud of Property Manager" in that on December 29, 2010 an adverse arbitration award was confirmed and entered as a judgment against DPR and Grubb in the Superior Court of the State of California County of Orange Case No. 30-2010-00430321-CU-PA-CJC (DPR then known as Triple Net Properties Realty, Inc.) which confirmed that DPR and Grubb had defrauded the investors, which was required to be disclosed but was concealed;

    vi.    The books of the respective companies were kept open long after closing was required in order to make bogus entries to conceal the true financial

4.

condition;

vii.    The companies shared offices, equipment, personnel and accountants and attorneys;

viii.    The companies had only internal accountants under control of Mikles and Locoh;

ix.    Money was moved between companies based upon transactions without fair and adequate consideration;

x.    The companies were not going concerns on an accounting basis which facts were concealed from counter parties to contracts;

xi.    No corporate or company records were maintained other than to perpetrate a continuing fraud against investors;

xii.    Documents were back dated to perpetrate a fraud against investors;

xiii.    Documents were changed without regard to the substance of the underlying transactions in order to deceive the investors and counter parties to agreements that required financial disclosures; and

xiv.    MIKLES made up his own journal entries in the books and records without regard to substantive grounds therefore.

14.    Defendant and Debtor DAYMARK PROPERTIES REALTY, INC. f.k.a. Triple Net Property Realty, Inc. ("DPR") is a California corporation organized July 6, 1998 as Entity Number: C2113477, California Bureau of Real Estate ("BRE") corporate license number 01304179 since March 8, 2001.

a.    Mikles, as described below, on and after August 2011, for times relevant was the BRE designated officer of DPR and as such responsible for supervision of its operations and personnel.

b.    DPR for all times relevant was the alter ego of DRA and Mikles.

c.    DPR was a wholly owned subsidiary of DRA until January 2013 when Mikles, after he bought out Locoh, caused DRA to sell all of the common stock of DPR to Dei Doge, Inc. which he also controlled.

**Class Action Adversary Complaint**

d.      Debtor DRM  was also a wholly owned subsidiary of DRA until January 2013 when Mikles, after he bought out Locoh, caused DRA to sell all of the common stock of DRM to Dei Doge, Inc.

e.      The common stock of Dei Doge Inc. is 100% owned by Great Plains, LLC.

f.      All of the membership interests of Great Plains, LLC are owned by BMR Irrevocable Trust the trustee of which Franz Tisello, a Cook Islands attorney.

g.      Upon information and belief Mikles controls directly or indirectly all of the beneficial interests of  BMR Irrevocable Trust. As such, Mikles controls Debtors DRA, DPR and DRM.

**C.      The Doe Defendants**

15.      The Doe Defendants named herein as Does 1-50, inclusive, and each of them, are unknown to Plaintiffs, who therefore sue such defendants by fictitious names pursuant to Code of Civil Procedure § 474.  Plaintiffs are informed and believe, and thereon allege, that each fictitiously named Doe defendant is in some manner, means or degree responsible for the events and happenings herein alleged.  Plaintiffs will amend this complaint, as necessary, to set forth the true names and capacities of the fictitiously designated Doe defendants when ascertained.

16.      In the event future discovery establishes that one or more lawyers or law firms conspired with and/or aided or abetted the defendants and therefore should be named in the place of any of the foregoing Doe Defendants, then to the extent applicable, if at all, Plaintiffs will comply with his/her/its/their obligations under California Civil Code § 1714.10, and any related/comparable statute, by bringing a motion seeking advance Court approval for any such substitution and will, in the context of such motion, present evidence establishing a reasonable probability that he/she/it/they will prevail on the merits of its claims against such lawyers and/or law firms.

**IV.**

**NON-PARTIES DEFINED FOR CONTEXT IN THIS ACTION**

17.      Dei Doge, Inc. ("Dei Doge") is a purported corporation the state of organization of which is unknown. Dei Doge's common stock is owned 100% by Great Plains, LLC.

6.

**Class Action Adversary Complaint**

18.     Great Plains, LLC ("Great Plains") is a purported limited liability company the state of organization of which is unknown. Great Plains' membership interests are owned 100% by BMR Irrevocable Trust.

19.     BMR Irrevocable Trust ("BMR") is a purported Cook Islands irrevocable trust, the purported trustee of which is Franz Tisello, a Cook Islands attorney. Plaintiffs allege that in fact Mikles controls DPR, Dei Doge, Great Plains and all of the beneficial interests of BMR.

20.     NNN Realty Advisors, INC. ("NNNRA") was organized on September 25, 2006 to serve as the holding company for DPR, NNNRI, and other entities in anticipation of a reverse merger with Grubb, a national real estate brokerage firm that was publicly traded on the New York Stock Exchange at the time. DRA in turn owns NNNRA.

21.     NNN Realty Investors, LLC ("NNNRI"), formerly known as Grubb & Ellis Realty Investors, LLC, was a Virginia limited liability company organized on April 27, 1998 and authorized to do business in California as of May 8, 1998.  NNNRI was for all times relevant simultaneously the formal "Advisor" to the COMPANY and its Members.

    a.     NNNRI was also manager of GREIT Liquidating Trust and its wholly owned subsidiary and ownership instrumentality GREIT Congress Center, LLC, which owned 30% of the Congress Center Property as described below.

    b.     NNNRI was thereby the advisor and fiduciary for the majority in interest of the tenant in common ownership of the Congress Center Property, the asset and property manager of which was simultaneously DPR.

22.     IUC-SOV, LLC ("IUC-SOV") is a Delaware limited liability company which acquired DRA in August of 2011 and from August 2011 until some time in late 2012 was owned by Locoh and Mikles 50% each through instrumentalities IUC and SOV respectively, both as defined below.

23.     Etienne Locoh ("Locoh") is an individual who for all times relevant until late 2012, was a control person, principal, director and officer of IUC-SOV, IUC, DRA, DPR, NNNRA, NNNRI, ARPT, ARP-OP, ARPA and NWCCO as described below.

//

**Class Action Adversary Complaint**

24.     IUC, LLC ("IUC") is a Delaware limited liability company which was the instrumentality by which Locoh acquired 50% of IUC-SOV and in turn DRA in August of 2011 and from August 2011 until some time in late 2012 when Mikles bought out Locoh and IUC.

25.     SOV-Daymark, LLC ("SOV") is a Delaware limited liability company which was the instrumentality by which Mikles acquired 50% of IUC-SOV and in turn DRA in August of 2011, and later 100% in late 2012 when Mikles bought out Locoh and IUC.

26.     SCRE Holdings of NV, LLC ("SCRE") a status revoked Nevada limited liability company organized March 31, 2004 as Entity No.: LLC6606-2004 the manager of which is Mikles. SCRE owns 100% of SOV.

27.     Todd A. Mikles ("Mikles") is an individual who for all times relevant, was a control person, principal, agent, director and officer of IUC-SOV, SOV, SCRE, DPR, Dei Doge, Great Plains, BMR, NNNRA, NNNRI, ARPT, ARP-OP, ARPA, NWCCO, SCMG and SSMF as described below.

28.     The American Recovery Property Trust, Inc. ("ARPT") was for times relevant, a Maryland corporation, also organized as a REIT, which was in turn is owned by entities owned and controlled by Mikles who for all times relevant served as its Director, President and Chief Executive Officer and until late 2012 Locoh, who until that time served as Chairman of its Board.  ARPT is an affiliate of Mikles, ARP-OP and ARPA.

29.     American Recovery Property, OP, LP ("ARP-OP") is a Delaware limited partnership wholly owned by ARPT, the general partner of which is an affiliate of ARPT. ARP-OP is an affiliate of ARPT and ARPA.

30.     American Recovery Property Advisors, LLC ("ARPA") is a limited liability company organized and controlled for times relevant by Mikles and until late 2012 Locoh, to serve as the advisor to ARPT. ARPA is an affiliate of ARP-OP and ARPT.

31.     Sovereign Capital Management Group, Inc. ("SCMG") is a California corporation organized September 20, 2010 as Entity Number C3318067, with a BRE real estate broker Corporate License Identification No.: 01896668, issued April 13, 2011the Designated Officer of which is MIKLES, Officer License Identification No.: 01221665.

8.

**Class Action Adversary Complaint**

a.      SCMG acquired the stock of DPR, upon information and belief, in January 2013 from DRA, in a transaction negotiated by Mikles with himself and his affiliates on both sides, as both seller and buyer. The purported sale was a sham designed to strip assets from DPR and non-party DRM, transferring valuable assets to Mikles controlled entities and offshore trusts.

b.      Ultimately, as part of the January 2013 DRA to DPR sham sale, Mikles passed the ownership of the DPR stock to one or more intermediary entities, the ownership of which is BMR.

c.      SCMG succeeded NNNRI as Advisor to the COMPANY and Members and has continued to act in such role and because it and NNNRI for times relevant were under common control of Mikles who knowingly ratified the wrongful acts of DRA, DPR, NNNRA and NNNRI.

32.     Sovereign Strategic Mortgage Fund, LLC ("SSMF")is a California limited liability company organized August 5, 2008 as entity number 200822710170 and for all times relevant owned and controlled by Mikles. The sole member of SSMF as of January 2013 is SCMG.

**V.**

**CLASS ACTION ALLEGATIONS**

33.     This action is brought pursuant to and may be properly maintained and certified as a class action pursuant to the Federal Rules of Civil Procedure, Rule 23(a)(1)-(4) and Rule 23(b)(3) as to the plaintiff class.

34.     This action is appropriate for determination through the Federal Class Action Procedure (Fed. R. Civ. P. 23, et seq.), and the proposed Class Representative(s) herein seek to represent the following proposed Class:

**All persons who as of January 1, 2012 owned Beneficial Interests in**

**GREIT LIQUIDATING TRUST (the "Class").**

35.     Based upon information and belief, the class members number in excess of Thirteen Thousand Eight Hundred Fifty Six (13,856) persons who are citizens of the United

9.

**Class Action Adversary Complaint**

1   States, including in excess of Two Thousand (2,000) persons from the State of California and, as

2   such, are sufficiently numerous and geographically dispersed throughout the country that joinder

3   of all class members is impracticable. Said persons each invested an average of $31,561 in G

4   REIT, Inc. stock which in turn became, at the time of liquidation, the basis for the Beneficial

5   Interests, the Units, described herein, and in many instances are elderly and without sufficient

6   funds to protect their interests, and require representation in this action, and this bankruptcy case

7   and proceedings so that their rights and interests in the terminated TRUST will be protected. Said

8   Beneficiaries are so numerous and diversely situate as to make it wholly impracticable, if not

9   impossible, to bring them all before the Court in this action. The object of this action is the

10  adjudication of claims and rights which do or may affect specific property and transactions

11  involved in this action, to wit, the corpus and income of the TRUST, and a community of interest

12  exists between Plaintiffs and the members of the Class described herein as to questions of law

13  and fact involved, in that the principal object of this action is to secure an accounting of the

14  affairs of the TRUST and to recover for and on behalf of the TRUST and Beneficiaries damages,

15  including without limitation money, property and interests which have been wrongfully diverted

16  therefrom. The Beneficial Interests of the Beneficiaries as members of the class are in some

17  instances small, could not be vindicated without resort to repeated litigation with respect to the

18  same issues, and their representation herein is necessary to prevent a failure to do justice, as more

19  particularly hereinafter appears. The interests of the members of the Class, the Plaintiffs as

20  Beneficiaries are identical except for the quantum of their Beneficial Interest in the corpus and

21  income of the terminated TRUST, and the named Plaintiffs herein will fairly insure adequate

22  representation and protection on behalf of all of such Beneficiaries. Accordingly, it is necessary

23  to maintain this action as a class action on behalf of the Beneficiaries of the TRUST.

24       36.    Plaintiffs and the Class, as Beneficiaries of a terminated express trust, share a

25  common interest in the fidelity and fiduciary relationship of DRA and DPR and the proper

26  accounting for and distribution of trust income and corpus due to the Beneficiaries as well as

27  damages for the breaches of duty and aiding and abetting thereof as identified herein.

28  //

37.    Excluded from the foregoing Class are the officers, directors, partners, members and employees of defendants and its/his/their legal representatives, heirs, successors, and assigns, of such defendants including without limitation those identified as:

a.    Debtors' Proposed Plan and Disclosure Statement (Docket Nos. 71 and 72) Section 1.2.65 "Plan Sponsors" means, Sovereign Capital Management Group, Inc., Sovereign Strategic Mortgage Fund, LLC, Todd Mikles, Etienne Locoh, GCL, LLC, Infinity Group, Infinity Urban Century LLC, Cottonwood Residential, O.P., LP, Cottonwood Capital Property Management II, LLC, and Cottonwood Capital Management, Inc.

b.    Debtors' Proposed Plan Section 1.2.78 "Third Party Released Parties" means the Plan Sponsors and their predecessors, successors, agents, employees, related entities, insiders, subsidiaries, affiliates, insurers, reinsurers, heirs, attorneys, executors, administrators, officers, principals, parent corporations, representatives, members, managers, shareholders, employees, directors, assigns, trustees and subrogees.

38.    There are questions of law or fact common to the Class, including, but not limited to, the following:

a.    Whether the defendants breached fiduciary duties and/or conspired with others to breach such duties;

b.    Whether the defendants breached fiduciary duties and/or aided and abetted others to breach such duties;

c.    Whether the defendants misrepresented material facts in publishing communications regarding TRUST transactions and preparing and certifying reports thereon;

d.    Whether the defendants misrepresented material facts in failing to timely and accurately publish communications regarding TRUST transactions;

e.    Whether the defendants must disgorge and return the profits derived from the use and taking of the TRUST's properties and opportunities;

11.

**Class Action Adversary Complaint**

f.  Whether the defendants must disgorge and return the income and profits derived from the ownership and operation of the Western Place Property from 2012 through and including its 2014 sale as well as all fees charged for the 2012 and 2014, as well as the application and  dispositions thereof;

g.  Whether the defendants must disgorge and return the income and profits derived from the ownership and operation of the Congress Center Property from 2012 through and including its 2014 sale as well as all fees charged for the 2012 and 2014, as well as the application and  dispositions thereof;

h.  Whether the defendants must disgorge and return the income and profits derived from the ownership and operation of the Sutter Square Property from 2012 through and including its 2016 sale as well as all fees charged for the 2012 and 2016, as well as the application and  dispositions thereof;

i.  Whether the defendants must disgorge and return the income, fees and profits derived from the use of the $12,000,000 of Western Place Property equity obtained via the ARPT stock purchase and sale in 2012.

j.  Whether the defendants must disgorge and return the income, fees and profits derived from the $12,000,000 ARPT promissory note delivered in exchange for the Put Option in 2014;

k.  Whether Plaintiffs and members of the class are entitled to compensatory damages and the amount thereof;

l.  Whether Plaintiffs and members of the class are entitled to punitive and/or exemplary damages and the amount thereof;

m.  Whether Defendants breached their respective duties owed to the Plaintiffs and the Class they seek to represent;

n.  Whether Defendants were negligent and whether such negligence was a proximate cause of the damages sustained by the Class;

o.  Whether Defendants were grossly negligent and whether such gross negligence was a proximate cause of the damages sustained by the Class;

12.

p.      Whether Defendants violated any applicable federal and state securities laws, regulations and rules;

q.      Whether Defendants violated any applicable business and professions, codes, laws, regulations and rules;

r.      Whether Defendants knew or should have known that their activities would have caused damage to the Class; and

s.      Whether DRA and/or DPR's debt due to the Class is a nondischargeable debt pursuant to 11 U.S.C. § 523(a)(2), (4) and/or (6).

39.      Plaintiffs are members of the Class and their claims are typical of the claims of other class members.

40.      Plaintiffs will fairly and adequately protect the interests of the Class. There is no conflict of interest between Plaintiffs and other members of the Class.  Plaintiffs are represented by counsel experienced in class actions, trust and company governance, fiduciary duties and obligations, real estate, tenant in common interests and securities law.

41.      The questions of law or fact, common to the claims of the Class predominate over any questions affecting only individual class members, so that the certification of this case as a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

42.      For these reasons, the proposed class may be certified under Rule 23 of the Federal Rules of Civil Procedure.

## VI.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### BREACH OF FIDUCIARY DUTY

#### Against All Defendants and Does 1-40

43.      Plaintiffs repeat and incorporate herein by reference the allegations in the preceding paragraphs of this Complaint as if set forth fully herein.

//

13.

44.    This cause of action is asserted by Plaintiffs individually and in their capacity as representatives of the Class against all Defendants and Does 1-40.

45.    Pursuant to a Proxy Statement associated with the plan of liquidation dated January 19, 2006 G REIT, Inc. provided that from July 22, 2002 through December 31, 2004 it sold and issued 43,865,000 shares of its common stock at a price of $10.00 per share pursuant to a registration statement on Form S-11/A under the Securities Act resulting in its receipt of gross proceeds of $437,315,000 and net proceeds after selling expenses of $393,018,000.

46.    Plaintiffs and the Class acquired their common stock in G REIT, Inc. in the time period July 22, 2002 through December 31, 2004 investing an average of $31,561 and as of January 22, 2008 are Beneficiaries of the now terminated TRUST and hold the Beneficial Interests therein with rights to the corpus and income of the TRUST.

47.    G REIT, Inc. was formed as a Real Estate Investment Trust operating in an umbrella partnership structure in which it served as general partner of its subsidiary partnership G REIT, L.P. and limited liability companies, including without limitation GREIT Congress Center, LLC, which in turn owned the respective real estate investments and properties or fractional interests therein as Tenants in Common ("TIC").

48.    On December 19, 2005, the board of directors of G REIT, Inc. approved a plan of liquidation which was thereafter also approved by the stockholders of G REIT, Inc. at the Special Meeting of Stockholders held on February 27, 2006. At the time of adoption, the G REIT plan of liquidation contemplated the management and sale of all of G REIT, Inc.'s remaining assets, the payment of its liabilities, the winding up of operations and the dissolution of G REIT, Inc.

49.    The TRUST was organized on January 22, 2008, as a liquidating trust pursuant to the foregoing plan of liquidation of G REIT, Inc. On January 28, 2008, G REIT, pursuant to the plan of liquidation, transferred its then remaining assets and liabilities to trustees who have since lost authority to act as a result of termination of TRUST. Upon the transfer of the assets and liabilities of each stockholder of G REIT, Inc. as of January 22, 2008, the Record Date, automatically became Beneficiaries of the TRUST and the holder of one "Unit" of Beneficial Interest, for each share of G REIT, Inc. common stock then currently held of record by such

14.

1  stockholder. The TRUST Units were not and as a condition of the liquidating plan, are prohibited

2  from being reflected in certificate form in that said Units are not tradeable.

3      50.     The stated purpose of the TRUST was to wind up the affairs of G REIT by

4  liquidating the remaining assets, distributing the proceeds from the liquidation of the remaining

5  assets to the Plaintiffs and the Class.

6      51.     The TRUST was to end or terminate upon a date certain for distribution of all the

7  remaining "Trust Assets" unless the trustees obtained a "no-action assurance" from the Securities

8  and Exchange Commission ("SEC").

9      52.     On August 5, 2010 TRUST obtained a "no-action assurance" letter from the SEC

10  which expressly provided:

11              ...the Liquidating Trust **will terminate upon the earlier of the
                **distribution of all of its assets in accordance with the terms of the**

12              **Liquidating Trust Agreement or <u>January 28, 2014</u>** (provided that if the
                Liquidating Trust's existence is extended beyond such date, the
                Liquidating Trust

13              will request and receive additional no-action assurance from the Division

14              prior to such extension)...
                *Bold and underline emphasis added.*

15

16      53.     A 2010 announcement from the TRUSTS then trustees, now terminated,

17  confirmed "Our existence will terminate upon the earlier to occur of (I) the distribution of all of

18  our remaining assets in accordance with the terms of the Liquidating Trust Agreement, or

19  **(ii) January 28, 2014**." *Bold emphasis added.*

20      54.     Plaintiffs allege that the TRUST terminated on January 28, 2014 because the

21  TRUST's term was <u>not</u> further extended on or before that date by an SEC "no-action" letter and

22  as such the TRUST by its terms terminated on January 28, 2014 and with it the purported

23  trustees' power to act.

24      55.     As a matter of background, Grubb was, by the mid-1980s, the third largest

25  commercial real estate firm in the United States. On December 10, 2007 (approximately five

26  years *after* G REIT, Inc. was formed and its stock subscribed, and almost two years *after* its

27  liquidation plan was approved but *only two months before* transfer of its assets to TRUST),

28  Grubb with NNNRA (the parent company of Triple Net Properties, LLC, the predecessor of

**Class Action Adversary Complaint**

Defendant NNNRI, the sponsor/promoter of G REIT, Inc.), succeeding to the management rights to its 1031 Tenant in Common ("TIC") DPR managed portfolio of commercial and apartment properties and the NNNRI advisory contracts to various entities including the TRUST.

56.     As further background, from its founding in 1998, Triple Net Properties, LLC (which was later the wholly owned subsidiary of NNNRA to merge with Grubb), the predecessor of NNNRI, had sponsored more than 150 TIC investment programs and a substantial number of other securities offerings including G REIT, Inc. and all of the TIC owners of the Congress Center Property. As sponsor, it acquired, syndicated and managed commercial properties for TIC ownership and various Real Estate Investment Trust offerings including G REIT, Inc. Triple Net Properties, LLC fulfilled that role for G REIT, Inc. and then the TRUST through its asset and property manager DPR for all of its managed commercial properties including the Congress Center Property, 30% of the ownership of which was held by TRUST through sole ownership of its subsidiary GREIT Congress Center, LLC.

57.     Post merger in 2010, Grubb created DRA as a wholly owned subsidiary which in turn owned the various Triple Net named affiliated companies including DPR, the asset and property manger to the TIC portfolio of commercial real estate, as well as the remaining three real estate properties held then by TRUST and its various advisory contracts through NNNRI. As a result, the DRA entities, including DPR and NNNRI, continued to serve as asset and property manager as well as Advisor, respectively to the TRUST and post January 28, 2014 to the Plaintiffs and Class of Beneficiaries.

58.     Upon information and belief in 2011 as Grubb sought a purchaser for DRA it knew and disclosed to Mikles and Locoh that DRA and all of its subsidiaries that were reflected in consolidated financials were insolvent and that a material capital contribution to NNNRI exceeding $10,000,000 would be required to avoid material defaults in various secured lending agreements as to which NNNRI was guarantor and DPR asset and property manager.

59.     In August, 2011, Grubb sold its entire interest in DRA to Locoh and Mikles, the "Daymark Acquisition", and therein  Locoh and Mikles assumed control of the entire DRA portfolio of TIC properties, the asset and property manager of which was DPR, and the numerous

16.

1  manager and advisory contracts with NNNRI, including all those it had acquired in the 2007

2  merger with NNNRA.

3      60.   In February, 2012, Grubb filed for bankruptcy and is no longer a going concern.

4      61.   Subsequent to August 2011, and for all time relevant herein, Locoh, Mikles and

5  his/its/their affiliates through DRA had complete control over NNNRI the COMPANY Manager

6  and DPR the asset and property manager of the Property, including thereby Plaintiffs' TIC

7  interest therein.

8      62.   Under terms of the Advisory Agreement, a copy of which is attached hereto as

9  Exhibit "A" and incorporated herein by this reference, which was ratified and approved by

10 TRUST and DRA's NNNRI and DPR and then continuously renewed without interruption from

11 inception of G REIT, Inc. in 2002, the Advisor NNNRI, the control persons of which were Locoh

12 and Mikles as of August 11, 2011, and TRUST agreed:

13     a.   That DRA's alter ego NNNRI, as Advisor, has responsibility for TRUST

14          day-to-day operations, administers TRUST accounting and bookkeeping

15          functions, serves as a consultant in connection with policy decisions to be made

16          by the TRUST's trustees, manages TRUST properties and renders other services

17          deemed appropriate by the TRUST's trustees. (Complaint Exhibit A pages 6-8

18          generally and specifically Paragraph 2 internal pages 5-8.)

19     b.   DRA's alter ego NNNRI, as Advisor, represented and acknowledged that it had

20          fiduciary duties to the Shareholders until G REIT Inc. liquidated and then to the

21          TRUST Beneficiaries and hence the Class. (Complaint Exhibit A specifically

22          Paragraph 2 p. last sentence, page 9 (internal page 8).)

23     c.   DRA's alter ego NNNRI, as Advisor, and its Affiliates including DPR would be

24          compensated as follows:

25     d.   A real estate commission up to 3% where TRUST acted as seller of its property.

26          (Complaint Exhibit A Paragraph 9(b) page 9 (internal page 9).)

27     e.   An Acquisition Fee of up to .5% on assets purchased. (Complaint Exhibit A

28          Paragraph 9(c) page 9 (internal page 10).)

17.

**Class Action Adversary Complaint**

f.    A Property Disposition Fee of the lesser of 3% of the contracted sales price or 50% of the Competitive Real Estate Commission. (Complaint Exhibit A Paragraph 9(e) page 10 (internal page 11).)

g.    A Property Management fee payable to DPR equal to 5% of the Gross Income from the TRUST properties. (Complaint Exhibit A Paragraph 9(f) page10 (internal page 11).)

h.    An Incentive Distribution of 15% of Operating Cash Flow after the Beneficiaries had been paid a particular level of return. (Complaint Exhibit A Paragraph 9(h) page 10 (internal page 11).)

i.    Administrative fees not to exceed 2% of the assets under management or 25% of the Net Income of the TRUST. (Complaint Exhibit A Paragraph 14 pages 13-14 (internal pages 14-15).)

j.    DRA's alter ego NNNRI, as Advisor, and its Affiliates including DPR received the above fees on a continuous basis on and after January 1, 2012 including during the course of the transactions described herein regarding the sales of the Western Place Property, the Congress Center Property and the Sutter Square Property and thereafter while the ARPT Shares were held and then the $12,000,000 note including interest payments thereon.

63.    Importantly, Grubb's August 2011 sale to Locoh and Mikles resulted in a change in control of 100% of the stock of DRA and therein its subsidiaries and alter egos NNNRI and DPR.

64.    Upon information and belief Mikles and Locoh post Daymark Acquisition failed and refused to adequately capitalize DRA and in particular NNNRI and DPR, and instead devised a plan and scheme to strip the remaining assets from DRA, NNNRI and DPR, and transfer the same to his/its/their various affiliates including IUC-SOV, SOV, SCRE, Dei Doge, Great Plains, BMR, NNNRA, NNNRI, ARPT, ARP-OP, ARPA, SCMG, SSMF and Does 1-40. At the time Mikles and Locoh undertook this effort he/it/they had actual knowledge that NNNRI had guaranteed numerous bank loans including the loan which was secured by the Congress

18.

**Class Action Adversary Complaint**

Center Property yet engaged in transactions adverse to TRUST including by:

   a.    Refusing to infuse not less than $10,000,000 of capital into NNNRI such that it had the requisite net worth to comply with the terms of its numerous loan guaranties including the Congress Center Property loan, and

   b.    Transferred valuable contracts and receivables of NNNRI and DPR to SCMG leaving NNNRI and DPR as well as DRA even more insolvent than at the time he/it/they closed the DRA purchase.

65.   The PMA expressly provides:

2.2 <u>Management</u>. Property Manager shall manage, operate and maintain the Property in an *efficient, economic, and satisfactory manner and shall manage the performance of everything reasonably necessary for the proper operation of the Property* for the tenants thereof, subject to (a) applicable governmental requirements, and (b) the *terms and provisions of this Agreement*. At the expense of each of the Tenants in Common, based on their undivided interests in the Property, Property Manager shall keep the Property clean and in good repair, shall order and supervise the completion of such repairs as may be required and shall generally do and perform, or cause to be done or performed, all things necessary or required for the proper and efficient management, operation, and maintenance of the Property, provided each of the Tenants in Common, based on their undivided interests in the Property, in a manner reasonably satisfactory to Property Manager, make available to Property Manager sufficient sums to pay the costs thereof. *Property Manager shall perform all services <u>in a diligent and professional manner</u>*.
...

10. **<u>TERMINATION.</u>**
   10.1 <u>Termination by Tenants in Common</u>. Each of the Tenants in Common shall have the right to terminate this Agreement: (a) *without cause, within thirty (30) days of each anniversary of the date hereof* and upon payment of their pro rata share of a termination fee of One Million Three Hundred Forty-Two Thousand Three Hundred Fifty and 00/100 ($1,342,350) and (b) *"for cause," upon thirty (30) days prior written notice*. However, the Lender is required to approve the termination in writing before any such termination shall be effective. For purposes of this Agreement, *termination "for cause" shall mean termination due to the (a) <u>gross negligence or fraud</u> of Property Manager, (b) <u>willful misconduct or willful breach</u> of this Agreement by Property Manager, ( c) bankruptcy, <u>insolvency or inability of the Property Manager to meet its obligation as the same come due</u>, ....*
   In addition, this Agreement, on each anniversary date, shall be subject to renewal or termination by the Tenants in Common as provided by Section 6.12 of the Rev. Proc. *Thirty (30) days before each such anniversary date, the Property Manager shall give written notice to each Tenant in Common of its right to renew or not renew ("Original Notice")*. Absent receipt by the Property Manager of a written demand not to renew from any Tenant in Common within fifteen (15) days of the Original Notice, this Agreement shall be deemed renewed until the next anniversary date.
...

13.5 <u>Governing Law</u>. This Agreement shall be *governed by and construed in accordance with the internal laws of the State of Illinois* without regard to any choice of law rules.

19.

1      *Italics and double underscore emphasis added.*

2      66.     The breaches of the PMA, occurred at the earliest October 23, 2012 and pursuant

3   to Illinois law, 735 *Ill. Comp. Stat. Ann.* 5/13-206, made applicable to the PMA Breach of

4   Contract, Breach of Fiduciary Duty and related contract and tort claims arising therefrom, as here

5   alleged, may be brought within ten (10) years of the breach and as such, notwithstanding that

6   Illinois law also recognizes tolling of such claims to August of 2018, the claims herein are timely

7   without tolling.

8      67.     Plaintiffs allege that DRA and DPR never disclosed, as required to do so under

9   both the Advisory Agreement and PMA, as well as the respective covenant of good faith and fair

10  dealing, that DRA as well as its subsidiaries NNNRI and DPR were insolvent, that a fraud

11  judgment had been entered and that they were engaged in willful misconduct and breach, which

12  would have allowed Plaintiffs to terminate DPR as property manager and DRA's NNNRI as

13  Advisor without the millions in termination fees otherwise due, at the time of the Daymark

14  Acquisition and that post acquisition the plan and scheme was to not cure such insolvency and

15  disclose the fraud judgment. Instead their business plan was to, conceal the "for cause" grounds

16  to terminate all DPR asset and property management contracts and NNNRI Advisor contracts

17  and to strip assets from DRA's alter ego subsidiaries, including DPR, and to force the sale of TIC

18  properties in order to garner substantial fees and commissions for Locoh, Mikles, ARPT, SCMG,

19  SSMF, ARP-OP, ARPA and affiliates including to transfer funds to BMR (off shore foreign

20  trusts) to benefit Locoh and Mikles.

21     68.     At the time of the Locoh and Mikles acquisition of DRA, the TRUST had three

22  remaining assets all managed by DRA's alter egos DPR as asset and property manager and as to

23  which NNNRI simultaneously served as TRUST Advisor, specifically:

24     a.      A 30% TIC interest in the "Congress Center Property" owned by TRUST

25             subsidiary, GREIT Congress Center, LLC, a 525,000 square foot Class A office

26             building located in Chicago, IL, which had been acquired January 9, 2003 for a

27             proportionate share (30%) of the purchase price of $40,832,000 by a cash

28             investment of $12,069,000 and debt of $28,763,000. The Congress Center

20.

1    Property was acquired at an overall purchase price from an unrelated seller for

2    $136,108,000 with related purchase money debt of $95,950,000.

3    b.    100% of the Western Place I & II Property (the "Western Place Property") owned

4    by TRUST subsidiary, G REIT Western Place, L.P., a 431,000 square foot Class

5    A office building located in Fort Worth, TX, which had been acquired July 23,

6    2004 for a total purchase price of $33,500,000. Prior to 2012 all debt had been

7    retired.

8    c.    100% of Sutter Square Galleria (the "Sutter Square Property") owned by TRUST

9    subsidiary GREIT Sutter Square, L.P., a 61,036 square foot mixed use building on

10    2.48 acres, acquired on October 28, 2003 subject to a ground lease expiring 2030

11    with a 10 year option for a purchase price of $8,240,000. Prior to 2012 all debt

12    had been retired.

13    69.    In August 2011 DRA's alter ego NNNRI was simultaneously serving as Advisor

14    to the TRUST while also serving as the Manager of the remaining in excess of 100 acquisition

15    entities that had been formed to acquire each of the TIC syndicated properties commonly referred

16    to as "TICS 0", including NNN Congress Center, LLC ("NNNCC") which in turn owned

17    28.879% of the Congress Center Property and was managed by NNNRI- thereby DRA's NNNRI

18    controlled 58.879% of the Congress Center Property ownership.  Also, recall the Congress

19    Center Property was managed by DPR on behalf of all TIC owners including TRUST's

20    subsidiary GREIT Congress Center LLC and NNNCC.

21    70.    In addition to its Advisor role to TRUST and its manager role to the TICS 0 that

22    in turn owned fractional interests in many of the syndicated properties,  DRA's NNNRI had

23    guaranteed the acquisition related indebtedness including the Congress Center Property debt with

24    a covenant that NNNRI was to have and maintain a minimum net worth of $10,000,000.

25    71.    Upon information and belief prior to the change in control resulting from the

26    Locoh and Mikles Daymark Acquisition via the DRA stock purchase in August 2011, the

27    Congress Center Property was able to pay its operating expenses and service its loan without

28    difficulty. The property was not distressed in any way. Recall the other two TRUST properties,

21.

**Class Action Adversary Complaint**

the Western Place and Sutter Property, were at that time debt free.

72.    Upon information and belief not later than December 2011 the lenders to the numerous DPR managed TIC properties including the Congress Center Property notified  DRA's NNNRI, as Advisor, DPR as asset and property manager, Locoh, Mikles and the trustees that as a result of the change in control of the DRA, Locoh and Mikles upon the Daymark Acquisition, DRA as the parent of NNNRI and DPR, a default was pronounced regarding the Congress Center Property loan, the balance of which was then $88,000,000, a 1% transfer fee of $880,000 was imposed, a 4% default interest rate was declared increasing the rate to approximately 10%, and the loan guarantor NNNRI's net worth had fallen below $10,000,000 requiring a new guarantor and as a result of said cumulative defaults and others, the loan was accelerated, all due and owing including more than $2,000,000 as a defeasance fee.

73.    Upon information and belief, as a result of the foregoing defaults, the Congress Center Property could no longer service the NNNRI guaranteed debt given the acceleration, default interest rate, fees due and defeasance fee and as a result the property was thereupon considered distressed, thereby adversely and materially affecting its market value.

74.    The Plaintiffs and the Class were not informed that as a result of the Locoh and Mikles acquisition of DRA, the Congress Center Property was now at risk of loss, had incurred millions in default and defeasance fees and charges, default interest had been levied, the Property was distressed, under threat of foreclosure with acceleration of the balance due on the $88,000,000 loan (plus all imposed default fees/charges and defeasance due) and that the cause of the defaults was the Locoh and Mikles 'change in control' of DRA as well as the aggregate consolidated negative net worth of $18,000,000 of DRA, the parent of the asset and property manager DPR and NNNRI as the Advisor manager of the tenant in common owners including NNNCC and GREIT Congress Center, LLC which was simultaneously acting as Advisor to TRUST and DPR which was the asset and property manager for TRUST. As such DRA and DPR, concealed that the cause of the Congress Center Property distress was in fact the actions of Locoh and Mikles who in turn controlled DRA, NNNRI and DPR the Advisor and managers to TRUST and refused to adequately capitalize those companies to raise the aggregate net worth to

22.

a positive $10,000,000 (which required not less than $28,000,000 of capital contributions).

75.     Based upon information and belief, in April 2012 with a closing date of May 16, 2012, DRA, DPR and Does 1-40 conspired with the trustees whereby the trustees of TRUST agreed to sell the Western Place Property for a below market price of $32,000,000 to the Locoh and Mikles controlled ARPT payable $20,000,000 in cash and the issuance of ARPT securities, 1,200,000 shares of non-voting common stock, purportedly valued at $10.00 per share with a "put option" that required ARPT to purchase the shares for $12,000,000 cash if the ARPT shares were not registered for sale on a national exchange within two years of closing or April 2014 (the "Western Place Agreement").  In closing the purchase of the Western Place Property and entering into the Western Place Agreement, DRA, DPR and Does 1-40 had actual knowledge the sale was at substantially less than its market value and issuing 1,200,000 shares of non-voting ARPT stock to TRUST that was valued, given its non-control and non-voting rights, at substantially less than $10.00 per share, was adverse to the Beneficiaries, the Plaintiffs and Class.

76.     In breach of their duties of care, good faith and loyalty, at no time did DRA, DPR, and Does 1-40 disclose that the Western Place Agreement, the very first agreement from the then effectively insolvent ARPT, would give sole control of the TRUST's minimum $12,000,000 of equity in ARPT to Locoh, Mikles, IUC-SOV, SOV, SCRE, Dei Doge, Great Plains, BMR, ARPT, ARP-OP, ARPA,, SCMG and SSMF to use as ARPT's newly minted equity so it could sign as a replacement guarantor with a $10,000,000 net worth for the insolvent DRA's alter ego NNNRI on the Congress Center Property loan guarantee, restructure the debt and cause a Mikles affiliate NW Congress Center Owner LLC ("NWCCO"), described below, to purchase the now distressed Congress Center Property, including TRUST's 30% interest at a deep discount price of $95,000,000, a $41,100,000 loss from the *nine years earlier* original 2003 purchase price and the November 2011 lenders' appraisal, while under threat of foreclosure, as a result of the above described lender declared defaults and loan acceleration, caused by Locoh and Mikles acquisition of DRA and concealment of DRA and DPR's insolvency.  Indeed, the material facts of the cause of the distress to the Congress Center Property were concealed from the Beneficiaries including their right under the PMA Section 10.1 to immediately terminate all property and advisory

23.

1    agreements "for cause" without the millions in penalties otherwise due.

2        77.    NWCCO was organized on September 18, 2012 and described in various news

3    releases including October 26, 2012 as a joint venture between Mikles' ARPT and ARP-OP on

4    the one hand and Northwood Investors, LLC ("Northwood") a principal of the joint venture

5    formed not later than March 1, 2012 where Mikles served as co-partner with and agent for the

6    venture, with the objective and purpose of acquiring the Congress Center Property through a

7    special purpose entity that was to be funded prior to closing and became known as NWCCO.

8        78.    Upon information and belief, on October 23, 2012 DRA's NNNRI as Advisor and

9    DPR as asset and property manager to the TRUST and its Beneficiaries, as a step in the secret

10   plan and scheme described above, recommended that TRUST close the sale of TRUST's 30%

11   share of the Congress Center Property for $95,000,000 to NWCCO, at a *loss of $41,100,000*

12   (compared to the original purchase price of $136,100,000 in 2003) and the lender's appraisal in

13   November 2011. The TRUST received a mere $1,765,863 for its 30% TIC interest resulting in a

14   *loss* of $10,303,137 (Equity from 2003 $12,069,000-$1,765,863) nine years later.  DRA's

15   NNNRI as Advisor and DPR as asset and property manager to the TRUST and its Beneficiaries,

16   in addition to concealing the insolvency and right to terminate contracts, concealed that his/their

17   agreement with Locoh, Mikles, IUC-SOV, SOV, SCRE, Dei Doge, Great Plains, BMR,

18   NNNRA, NNNRI, ARPT, ARP-OP, ARPA, SCMG and SSMF to NWCCO was a step in the

19   transaction that commenced with the Western Place Property sale which created $12,000,000

20   plus of ARPT equity in order to disadvantage the TRUST with the sale and purchase of Congress

21   Center Property using the TRUST's very own equity to allow Locoh, Mikles, IUC-SOV, SOV,

22   SCRE, Dei Doge, Great Plains, BMR, NNNRA, NNNRI, ARPT, ARP-OP, ARPA, SCMG,

23   SSMF, Northwood and NWCCO to take advantage of the DRA and DPR breach of duty in

24   causing the loan defaults, concealing the insolvency and their misconduct.  In the process the

25   accrued but unpaid management fees with interest due by TRUST to NNNRI and DPR at the

26   closing of the Congress Center Property sale were assigned to SCMG without fair and adequate

27   consideration.

28   //

**Class Action Adversary Complaint**

Case 19-01048-SMG   Doc 1   Filed 03/04/19   Page 28 of 46

79.     Fourteen months later in March of 2014 NWCCO controlled by Locoh, Mikles, IUC-SOV, SOV, SCRE, Dei Doge, Great Plains, BMR, ARPT, ARP-OP, ARPA, SCMG, SSMF and Northwood sold the Congress Center Property for $135,000,000 and upon information and belief realized a profit of $40,000,000 in addition to substantial operating profits and fees during the short period the property was held. Northwood also received a return of its capital contribution used to meet the debt pay down obligations required by the MIKLES negotiated loan modification.

80.     Also in October of 2012, DRA's NNNRI as Advisor and DPR as asset and property manager to the TRUST and its Beneficiaries, as another step in the secret plan and scheme described above, recommended that TRUST sell its 100% interest in the Sutter Square Property to Mikles and an SCMG controlled entity for $2,500,000, a loss to the TRUST and its Beneficiaries measured against its $8,240,000 original purchase of $5,740,000.

81.     Four years after his purchase in September 2016 Mikles and SCMG sold the Sutter Square Property to a private investor, Rakesh D. Dhir for $7,900,000 and a profit of $5,400,000.

82.     Plaintiffs allege that had the Beneficiaries been properly advised while holding the unencumbered Sutter Square Property in 2012 they would have held the property for a sale at the original purchase price rather than incurring a loss and allowing Mikles, SCMG and Does 1-30 to reap a profit of $5,400,000.

83.     The TRUST by its terms terminated in on January 28, 2014 and the Beneficiaries were entitled immediately to all of the assets.

84.     At the time of the January 28, 2014 termination, ARPT had not gone public and the Western Place Agreement and related Put Option of $12,000,000 was outstanding. Mikles was at the time simultaneously the CEO of ARPT, as well as controlled its Board of Directors with fiduciary duties to the TRUST Beneficiaries as ARPT shareholders.  Mikles was also in control of DRA's NNNRI and as such the Advisor to TRUST and Beneficiaries.

85.     Mikles, ignoring the fact the TRUST had terminated, conspired with the former trustees of TRUST as if the TRUST continued in existence, because he did not have the

25.

1    $12,000,000 required to pay the Put Option in full in January 2014 to TRUST's Beneficiaries in

2    that he had, as described below, used the funds for other self-serving investments against the

3    interests of Beneficiaries. Moreover, Mikles at this point had bought out Locoh and had

4    transferred beneficial interests of DPR and its affiliated DRM as well as SSMF and SCMG to

5    BMR in order to conceal assets in the Cook Islands.

6          86.    DRA's NNNRI as Advisor and DPR as asset and property manager to the TRUST

7    and its Beneficiaries, now both under control of Mikles, had a duty to fully inform it/them of

8    DRA and DPR's serial breaches of fiduciary duty but elected to continue to conceal the same.

9          87.    Plaintiffs allege that DRA and DPR owed following fiduciary duties and

10    obligations to the Beneficiaries, including without limitation the following:

11        a.    To disclose fully and fairly all material information within its/their knowledge and

12              control.

13        b.    To not omit facts which would significantly alter the 'total mix' of information

14              made available.

15        c.    To put the interests of the Beneficiaries ahead of its/their own interest.

16        d.    To not use his/their control over TRUST property to benefit itself/themselves and

17              their affiliates including the NNNRI, ARPT, SCMG, SSMF and BMR at the

18              expense of Beneficiaries.

19        e.    To take all reasonable steps to maximize the value of TRUST assets and

20              opportunities.

21        f.    To ensure that Beneficiaries would receive the greatest possible return on

22              his/her/their Beneficial Interests.

23        g.    To, among other things, not use their positions as Advisor and asset and property

24              manager to benefit themselves and other insiders at the expense of the TRUST.

25        h.    To establish and ensure through sufficient processes, governance and internal

26              controls that the TRUST's financial reporting was full, complete and accurate and

27              that conflicts of interest were fully and properly evaluated and resolved in strict

28              favor of the TRUST.

1       i.     To act in the best interests of the TRUST and its Beneficiaries.

2      88.    Plaintiffs allege that DRA, DPR and Does 1-10 breached its/their duties of

3 loyalty, care and good faith and fair dealing to the Beneficiaries in that it/they in the face of a

4 clear conflict of interest, acting in bad faith and self interest, preferred the interests of SCMG,

5 SSMF, BMR and its/their affiliates, over the Beneficiaries, including without limitation, as

6 follows:

7      a.     By failing to promptly and fully inform the Beneficiaries of the actual reason for

8              and implications of the change of control loan default against the Congress Center

9              Property immediately in December 2011.

10     b.     By failing to promptly and fully inform the Beneficiaries that the cause of the

11             Congress Center loan default was the Locoh and Mikles acquisition of DRA and

12             thereby the change of control of DRA, NNNRI and DPR.

13     c.     By failing to promptly and fully inform the Beneficiaries that DRA and DPR

14             through Mikles and Locoh were not considered "going concerns" and were

15             "doubtful to continue operations" because the aggregate net worth of DRA and its

16             subsidiaries, including NNNRI and DPR, were negative $18,000,000 and that

17             Mikles and Locoh had secretly elected not to adequately capitalize DRA nor any

18             of its subsidiaries but that instead they were going to strip all assets away from the

19             insolvent companies for their own self-serving purposes against the interests of

20             the property owners including the Beneficiaries.

21     d.     By failing to promptly and fully inform the Beneficiaries that DRA and DPR were

22             insolvent and that a fraud judgment had been entered, and that as a result the three

23             asset and property management agreements with DPR could be terminated "for

24             cause" without the need to pay millions in termination fees so that a replacement

25             professional, qualified and adequately capitalized asset and property manager

26             could be retained to maintain ownership of all three properties and in particular

27             the encumbered Congress Center Property.

28 //

27.

e.   By failing to promptly and fully inform the Beneficiaries that DRA and DPR through Mikles and Locoh had not adequately funded DRA and its subsidiaries as required by the August 2011 purchase, the asset and property management agreements and that a vendor to the Congress Center Property in the amount of less than $200,000 had contributed to the reasons the lender relied upon for the loan default.

f.   That as a result of the Congress Center Property loan defaults, the tenant improvement and leasing commission reserve, then with a balance of $4,700,000 in March of 2012, was being withheld by the lender.

g.   By failing to inform the Beneficiaries that the debt coverage ratio on the Congress Center Property had improved as of late 2011 to 1.18 up from 1.14.

h.   By failing to inform the Beneficiaries that the lender had appraised the Congress Center Property as of November of 2011 at $149,000,000.

i.   By concealing that DRA's NNNRI and therein DRA no longer had the requisite $10,000,000 net worth, which would be a loan covenant default on the Congress Center Property loan.

j.   By failing to engage an investment banker and real estate finance expert as of early January 2012 to make restructuring recommendations in order to protect the Property from foreclosure and the distressed insider sale to Locoh and Mikles affiliates.

k.   By concealing that at the time of the Daymark Acquisition, Locoh and Mikles had been informed during the course of their due diligence that DRA's various subsidiaries including DPR, NNNRI and DRM had a collective deficit net worth of over $18,000,000 which Locoh and Mikles, as a matter of their overall strategy, would not meet with adequate capitalization to bring the aggregate net worth to not less than $10,000,000 (requiring capitalization of $28,000,000.

l.   That because Locoh and Mikles never intended to operate DRA and its subsidiaries, including NNNRI and DPR, as going concerns their true goal in

28.

**Class Action Adversary Complaint**

1     completing the Daymark Acquisition was to strip all of the assets of DRA, DPR

2     and DRM in terms of its/their valuable advisory and asset and property

3     management contracts sending the money realized from essentially forced sales of

4     the managed properties to Locoh and Mikles affiliates and away from DRA, DPR

5     and DRM.

6   m.    That as a result of Locoh and Mikles true and undisclosed intent via the Daymark

7     Acquisition that their goal was to, in the short term, cause as many owners to sell

8     their properties, rather than as the asset and property management agreements and

9     their fiduciary duties as advisors and real estate brokers and asset managers

10    required to find solutions to retain the properties, find excuses and cause

11    anywhere they could to recommend the sale of the managed properties to realize

12    disposition fees, commissions and to collect accrued but unpaid asset and property

13    management fees with interest in the name of bargain sale assignments in favor of

14    SSMF, SSMF and BMR.

15   n.    Following the change in control of DRA, NNNRI and  DPR concealed the

16    insolvency of NNNRI that distressed the Congress Center Property and required

17    prompt restructuring to avoid a large loss.

18   o.    By failing to promptly terminate DRA's alter ego NNNRI agreement as TRUST

19    Advisor due to the conflict of interest that it was insolvent and a fraud judgment

20    allowing immediate termination "for cause" and such insolvency was a material

21    cause of the Congress Center Property loan default.

22   p.    By failing to promptly terminate DRA's alter ego DPR's asset and property

23    manger agreement due to the conflict of interest that it was insolvent and a fraud

24    judgment allowing immediate termination "for cause" and such insolvency was a

25    material cause of the Congress Center Property loan default.

26   q.    By failing to recommend the independent engagement an investment banker and

27    real estate finance expert as of early January 2012 to make restructuring

28    recommendations in order to protect the Congress Center Property from

29.

**Class Action Adversary Complaint**

1    foreclosure and the insider sale to Locoh and Mikles affiliates.

2    r.    By recommending the closing of the below market Western Place Property

3    transaction above described which wrongly risked not less than $12 million of

4    TRUST's equity therein to prefer the interests of Locoh, Mikles, ARPT, SCMG,

5    SSMF, BMR and affiliates over the Beneficiaries.

6    s.    By recommending the sale and closing the sale of the 30% interest in the Congress

7    Center Property transaction above described resulting in a locked in *loss* when

8    superior viable non-conflicted options to save the investment and avoid the loss

9    were available.

10    t.    By recommending the sale and closing of the conflicted Sutter Property

11    transaction above described resulting in a locked in loss of $5,740,000 when the

12    same should have been retained.

13    u.    By recommending the January of 2014 sale of 1,200,000 shares of ARPT non-

14    voting common stock to ARPT for essentially a worthless promissory note of

15    $12,000,000 which stock purchase transaction never should have been initiated in

16    the first instance for the reasons described herein.

17    v.    By closing the sale of the TRUST's interest in the Congress Center Property so

18    that Locoh, Mikles and affiliates could reap millions in fees, commissions,

19    disposition fees, equity in the joint venture and capital accounts and distributions

20    thereon.

21    w.    By failing to act in the best interests of the Beneficiaries.

22    89.    Plaintiffs allege that as a result of the misconduct described herein DRA and  DPR

23    breached fiduciary duties, acted in bad faith, in a grossly negligent manner, fraudulently and in

24    willful breach of the Advisor Agreement and the PMA.

25    90.    The DRA and DPR's foregoing misconduct was not, and could not have been, an

26    exercise of good faith business judgment. Rather, it was intended to, and did, unduly benefit

27    Locoh, Mikles, ARPT, SCMG, SSMF, BMR and affiliates in the above described self-serving

28    transactions at the expense and loss of the TRUST and Beneficiaries.

**Class Action Adversary Complaint**

91.    Plaintiffs allege upon information and belief that their compensatory damages, subject to proof at the time of trial, are approximately $100,000,000 (with pre-judgment interest), including without limitation, as follows:

a.    Recovery of 30.000% of the fees and commissions charged Plaintiffs on the sale estimated to be not less than $2,700,000.

b.    Because properly advised Plaintiffs would not have sold their interest in the Property, they would today own the Property as Liquidating Interests, recovery of damages based upon a 30.000% share of the value of the Property at the time of trial over estimated to be $155,000,000 against the outstanding loan at October 2012 of $88,000,0000 resulting in equity of $67,000,000 a 30.000% share is $20,100,000.

c.    In addition Plaintiffs would have retained operating income from the Property over the years estimated to be an additional $45,000,000 combined, 30.000% of which is $13,500,000.

d.    Damages from the premature sale of the Western Place Property which should not have been sold of $30,000,000.

e.    Damages from the premature sale of the Sutter Square Property which should not have been sold of $10,000,000.

92.    Because the conduct of all of Defendants was oppressive, malicious and/or fraudulent, Plaintiffs are also entitled to punitive and exemplary damages from each of such Defendants in an amount to be proved at time of trial.

### DELAYED DISCOVERY AND ESTOPPEL AGAINST DEFENDANTS TO ASSERT STATUTE OF LIMITATIONS DEFENSES

93.    As above described the material facts regarding the Locoh and Mikles acquisition of DRA causing the Congress Center Property loan default and the true purpose of the Western Place sale with the 1,200,000 non-voting share component, in addition to the opportunity to have terminated DRA's NNNRI Advisor Agreement and DPR's PMA "for cause" was concealed from Plaintiffs and the Class by DRA and DPR.

31.

1      94.    Plaintiffs and all Beneficiaries reposed trust and confidence in DRA's NNNRI as

2  TRUST Advisor and as Manager to GREIT Congress Center, LLC and DPR as asset and

3  property manager to the three TRUST properties, to discharge their fiduciary duties for the

4  benefit of Plaintiffs and the Class.

5      95.    Not until an investigation was conducted on behalf of Plaintiffs in December 2017

6  did they discover the relationship of the Locoh and Mikles acquisition of DRA, the Western

7  Place Property sale, the 1,200,000 ARPT share issuance and the related Congress Center and

8  Sutter Properties sales.

9      96.    Plaintiffs and the Class reposed trust and confidence in the DRA's NNNRI and

10  DPR to tell the complete truth and disclose all material facts about DRA's NNNRI and DPR's

11  insolvency and actions purportedly on behalf of the Beneficiaries including facts related to the

12  true reason for the Congress Center Property Loan default, the "for cause" termination options

13  and the purpose of the Western Place Property transaction involving the 1,200,000 ARPT non-

14  voting common shares for the $12,000,000 component of the purchase price consideration.

15      97.    Further, Plaintiffs and the Class relied upon statements authored by DRA's

16  NNNRI and DPR and published concerning the reasons for and actions of the TRUST

17  concerning the TRUST properties which as above described concealed material facts.

18      98.    Plaintiffs and the Class thus reasonably relied on the DRA's NNNRI and DPR

19  separately as his/her/its/their fiduciaries, to act in their best interests and refrain from misleading,

20  defrauding or otherwise intentionally or negligently injuring Plaintiffs and the Class.

21      99.    The true facts remained unknown to Plaintiffs and the Class until December 2017

22  when Plaintiffs' counsel investigated the $12,000,000 promissory note which remained

23  outstanding. In fact the www.greitinvestors.com website provided then as of March 23, 2018:

24          **UPDATE FOR ALL G REIT INVESTORS**
All G REIT investors should have recently received a distribution check

25  representing the first of three (3) distribution payments to be delivered in relation to the final liquidation and winding up of G REIT. To address

26  anticipated questions and in order to provide important information to investors, please see below:

27  **While we had expected to be in a position to issue a distribution by September 31, 2017, that date has necessarily been delayed.**

28  **Since, GREIT'S last remaining asset is a single promissory note in the**

32.

**Class Action Adversary Complaint**

1      **principal amount of $12,000,000, distributions depend on payments received toward the balance due on the Note. An extension on the**
2      **Note has caused this delay in providing investors with a distribution. A final distribution will be issued once the full amount due on the**
3      **Note is collected. At this time, the final distribution date is undetermined.**
4      **We will continue to update the GREIT website with information as it becomes available.**
5      Q: What assets does G REIT still own?
    A: A single promissory note (the "Note") in the principal amount of
6      $12,000,000.

7      ...
    Q: What is the current per Unit value?
    A: $0.23
8      Q: How was the current Unit value determined?
    A: The value of the Note, less estimated expenses, divided by total
9      outstanding Units.
    Q: Why did the value of Units drop from $0.26 to $0.23?
10      A: We have been able to more accurately calculate the total expenses that will be incurred in relation to final liquidation and dissolution of the G
11      REIT

12      100.    The Plaintiffs and Class were never aware of any facts that made him/her/it/them

13  suspicious of the veracity of DRA's NNNRI and DPR's actions on behalf of the Beneficiaries,

14  and did not discover the breaches of fiduciary duty and aiding and abetting thereof until

15  December 2017.

16      101.    Plaintiffs allege that they were unaware of the true facts regarding the reasons for

17  Congress Center Property loan default and related Western Place Property sale transaction's

18  purpose and the "for cause" termination option until December of 2017 and could not with

19  reasonable due diligence have learned of the same earlier because they did not have the benefit of

20  the independent research and investigation which their lawyers conducted through multiple third

21  party sources until the previously concealed true facts were disclosed. As such the statute of

22  limitations concerning this cause of action was tolled until December of 2017.

23      102.    Further, DRA's NNNRI and DPR did not disclose as they were required to do the

24  true facts regarding the reasons for the Congress Center Property loan default, the "for cause"

25  termination option and related Western Place Property sale transaction's purpose nor the

26  interrelatedness of the Sutter Property sale thereby concealing the same from Plaintiffs and the

27  Class.

28  //

### *THE NEED FOR A CONSTRUCTIVE TRUST*

103.    All Defendants and Does 1- 40 would be unjustly enriched if allowed to keep the assets, capital and profits derived from the wrongful conduct described herein and Plaintiffs and the Class, subject to proof at trial, are therefore entitled to a determination and judgment that Defendants and Does 1-40 hold such converted assets, capital and profits, as constructive trustees for the benefit of Plaintiffs and the Class.

### *THE NEED FOR AN ACCOUNTING*

104.    Plaintiffs and the Class do not know the exact amount owing to him/her/it/them as a result of Defendants and 1-40's misconduct above described. An accounting is therefore necessary to determine this amount and his requested hereby.

### SECOND CAUSE OF ACTION

### NONDISCHARGEABILTY AGAINST THE DEBTORS DRA AND DPR

### PURSUANT TO 11 USC § 523(a)(2)

105.    Plaintiffs repeat and incorporate herein by reference the allegations in the preceding paragraphs of this Complaint as if set forth fully herein.

106.    This cause of action is asserted by Plaintiffs individually and in their capacity as representatives of the Class of Beneficiaries against Debtors DRA and DPR.

107.    This cause of action is brought pursuant to 11 U.S.C. § 523(a)(2) under Title 11 of the United States Code, which provides as follows:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—
> ...
> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
> (A)  false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;
> (B)  use of a statement in writing—
> (I)  that is materially false;
> (ii)  respecting the debtor's or an insider's financial condition;
> (iii)  on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
> (iv)  that the debtor caused to be made or published with intent to deceive;...

108.    Debtors DRA and DPR are indebted to Plaintiffs and the Class as a result of DRA and DPR's false pretenses, a false representation and/or actual fraud because after Mikles and

34.

**Class Action Adversary Complaint**

Locoh acquired DRA it/they through multiple communications:

    a.    falsely represented to Plaintiff and the Class that DRA, DRA's NNNRI and DPR would act in the best interests of the TRUST and Beneficiaries regarding the three properties then owned by TRUST;

    b.    knew at the time of making these representations that the representations were false because Mikles and Locoh intended to strip the assets from DRA and its subsidiaries including NNNRI and DPR to further aggravate the insolvency that in fact existed, as well as the fraud judgment, at the time of the Daymark Acquisition in August of 2011 and was, in addition to the change in control, a further cause of default and which simultaneously gave rise to "for cause" termination of the Advisor Agreement and PMA without the millions in penalties which was concealed;

    c.    DRA and its subsidiaries including NNNRI and DPR made those representations with the intention and purpose of deceiving the Plaintiffs and the Class;

    d.    The Plaintiffs and the Class justifiably relied on these representations and did not terminate the Advisor Agreement and the PMA because they were not informed of the consolidated financial statements, commingling and overall insolvency; and

    e.    The Plaintiffs and the Class sustained losses as a proximate result of the debtors' representations.

109.    Plaintiffs and the Class are owed damages as a result of the wrongful conduct of Debtors DRA and DPR as above described in an amount to be determined at the time of trial.

110.    The debt due to Plaintiffs and the Class by DRA and its subsidiaries including NNNRI and DPR is not dischargeable.

## THIRD CAUSE OF ACTION

## NONDISCHARGEABILTY AGAINST THE DEBTORS DRA AND DPR

## PURSUANT TO 11 USC § 523(a)(4)

111.    Plaintiffs repeat and incorporate herein by reference the allegations in the preceding paragraphs of this Complaint as if set forth fully herein.

35.

112. This cause of action is asserted by Plaintiffs individually and in their capacity as representatives of the Class of Beneficiaries against Debtors DRA and DPR.

113. This cause of action is brought pursuant to 11 U.S.C. § 523(a)(4) under Title 11 of the United States Code, which provides as follows:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—
> ...
> (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;...

114. Debtors DRA and DPR are indebted to Plaintiffs and the Class as a result of DRA and DPR's fraud or defalcation while acting in a fiduciary capacity to the Beneficiaries, including without limitation, as described above at Paragraphs 87, 88 and subparagraphs above, fully incorporated hereat.

115. Plaintiffs and the Class are owed damages as a result of the wrongful conduct of Debtors DRA and DPR as above described in an amount to be determined at the time of trial.

116. The debt due to Plaintiffs and the Class by DRA and its subsidiaries including NNNRI and DPR is not dischargeable.

## FOURTH CAUSE OF ACTION

### NONDISCHARGEABILTY AGAINST THE DEBTORS DRA AND DPR

### PURSUANT TO 11 USC § 523(a)(6)

117. Plaintiffs repeat and incorporate herein by reference the allegations in the preceding paragraphs of this Complaint as if set forth fully herein.

118. This cause of action is asserted by Plaintiffs individually and in their capacity as representatives of the Class of Beneficiaries against Debtors DRA and DPR.

119. This cause of action is brought pursuant to 11 U.S.C. § 523(a)(6) under Title 11 of the United States Code, which provides as follows:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—
> ...
> (6) for willful and malicious injury by the debtor to another entity or to the property of another entity; ...

//

**Class Action Adversary Complaint**

120.    Debtors DRA and DPR are indebted to Plaintiffs and the Class as a result of DRA and DPR's willful and malicious injury to Beneficiaries, including without limitation, as described above at Paragraphs 87, 88 and subparagraphs above, fully incorporated hereat.

121.    Plaintiffs and the Class are owed damages as a result of the wrongful conduct of Debtors DRA and DPR as above described in an amount to be determined at the time of trial.

122.    The debt due to Plaintiffs and the Class by DRA and its subsidiaries including NNNRI and DPR is not dischargeable.

## FIFTH CAUSE OF ACTION

### BREACH OF CONGRESS CENTER PROPERTY PMA CONTRACT

#### Against DPR and Does 16-20

123.    Plaintiffs repeat and incorporate herein by reference the allegations in the preceding paragraphs inclusive of this Complaint as if set forth fully herein.

124.    This cause of action is asserted by Plaintiffs and the Class against DPR and Does 16-20.

125.    Plaintiffs allege that DPR was the TRUST and Beneficiaries' real estate broker and asset and property manager pursuant to the PMA which included without limitation the obligation to efficiently and professionally manage the three remaining assets, including the Congress Center Property, and make a recommendation to sell only when the same was in the best interest of the TRUST and Beneficiaries' and not motivated by an insider self-interested transaction involving an undisclosed dual agency and concealed material facts.

126.    Pursuant to the PMA, the written [PROPERTY] MANAGEMENT AGREEMENT attached hereto as Exhibit B and incorporated herein by this reference, DPR and Does 16-20 agreed to abide by its terms, including without limitation:

> 2.2 <u>Management</u>. Property Manager shall manage, operate and maintain the Property in an efficient, economic, and satisfactory manner and shall manage the performance of everything reasonably necessary for the proper operation of the Property for the tenants thereof, subject to (a) applicable governmental requirements, and (b) the terms and provisions of this Agreement. ... *Property Manager shall perform all services in a diligent and professional manner*.
> ...
> 10.3 <u>Termination On Sale</u>. This Agreement shall automatically terminate upon the sale of the entire Property ...

37.

...

11. <u>CONFLICTS</u>. Property Manager shall not deal with ... any subsidiary *or affiliated company of Property Manager in connection with the management of the Property for amounts above market rates*.

...

13.5 <u>Governing Law</u>. This Agreement shall be *governed by and construed in accordance with the internal laws of the State of Illinois* without regard to any choice of law rules.
*Italics emphasis added.*

107.    As above alleged the TRUST and Beneficiaries were a 30.00% TIC interest owner of the Congress Center Property and 100% interest holders in the Western Place and Sutter Square Properties.

108.    As above alleged DPR was an affiliate of the Locoh and Mikles controlled joint venture with Northwood, ARPT and ARP-OP, and later NWCCO, as well as its/their agent in secretly negotiating against the interests of the TRUST and Beneficiaries' when it:

a.    Failed to manage, operate and maintain the Congress Center Property in an economic, satisfactory and professional manner when it failed to take action on behalf of The TRUST and Beneficiaries when the Congress Center Property became distressed to cure the loan default known to have been the result of the Daymark Acquisition in a timely manner and to fully inform the TRUST and Beneficiaries of the true facts.

b.    Failed to inform the TRUST and Beneficiaries that DPR as well as its parent DRA were insolvent and that grounds existed to terminate the PMA "with cause" and avoid the in excess of $1 million fee so that an independent well capitalized new asset and property manager could be engaged to protect the Beneficiaries.

c.    Failed to diligently and professionally manage the Congress Center Property without conflicts of interest when it acted as agent real estate broker on behalf of the joint venture to acquire the Property at a distressed price that DPR and its affiliates had directly caused and at less than fair market value when it recommended and implemented the sale at a discount materially and substantially greater than market rates.

//

**Class Action Adversary Complaint**

d.   Recommended the sale of the Western Place Property in a self-serving transaction at below market rates and in return for which worthless ARPT stock and then a worthless note were delivered and exchanged when the property should have been retained.

e.   Recommended the sale of the Sutter Square Property in a self-serving transaction at below market rates when the property should have been retained.

127.   The DPR dual agency on behalf of Northwood, ARPT, ARP-OP and later NWCCO, as well as the wrongful conduct described herein, was unknown to the TRUST and Beneficiaries and therefore was not and could not have been approved.

128.   Plaintiffs' and the Class' performance conformed to the PMA in all material respects.

129.   Plaintiffs and the Class have performed all conditions, covenants, and promises required on their part to be performed in accordance with the terms and conditions of the PMA except to the extent otherwise excused by the conduct of DPR and Does 16-20.

130.   Plaintiffs continually requested, expected and had the right to expect that DPR and Does 16-20 would perform its/their obligations under the PMA as above described.

131.   Plaintiffs and the Class suffered and continue to suffer damages and harm from the conduct of DPR  and Does 16-20 as a result of the breach of the PMA as above described.

132.   The damages here involved from breach of the PMA and subject to proof at the time of trial, include those arising from the premature sale of the Congress Center Property at a loss resulting from a discount not justified, premature below market sale of the Western Place and Sutter Square Properties, as well as the loss of past and future net operating income from ownership of the Property, and appreciation thereon from the three properties continued ownership and management, had DPR and Does 16-20 performed pursuant to the PMA as agreed.

133.   The TRUST and Beneficiaries are also entitled to its attorneys fees and costs pursuant to PMA Paragraph 13.4.

//

39.

**Class Action Adversary Complaint**

134.    The addition of this claim to this complaint brought in Bankruptcy Court in Florida is not intended to waive applicability of Illinois law but is instead a requirement, given the status of the bankruptcy cases now pending.

135.    The breach of the PMA occurred at the earliest October 23, 2012 and pursuant to Illinois law, 735 Ill. Comp. Stat. Ann. 5/13-206, made applicable to the PMA Breach of Contract claim here alleged, may be brought within ten (10) years of the breach and as such, notwithstanding that Illinois law also recognizes tolling of such claims, the Plaintiffs' and Class' claims are timely without tolling.

## SIXTH CAUSE OF ACTION

### TORTIOUS INTERFERENCE WITH CONGRESS CENTER PMA CONTRACT

### Against all Defendants and Does 1-40, Except DPR

136.    Plaintiffs repeat and incorporate herein by reference the allegations in the preceding paragraphs inclusive of this Complaint as if set forth fully herein.

137.    This cause of action is asserted by Plaintiffs and the Class against all Defendants and Does 1-40, except DPR.

138.    During the course of their business relationship the TRUST and Beneficiaries and DPR agreed to be bound by the PMA attached hereto as Exhibit "B" and incorporated herein by this reference.

139.    Defendants DRA and Does 1-40 all had been given a copy of the PMA or had access to the same such that each had full knowledge of the terms thereof when each interfered with the PMA.

140.    Defendants DRA and Does 1-40's acts under the facts above alleged constitute wrongful interference with the PMA that resulted in the sale of the TRUST and Beneficiaries's TIC interest in the Congress Center Property which was adverse to the TRUST and Beneficiaries.

141.    Defendants DRA and Does 1-40 in taking the above alleged acts against the TRUST and Beneficiaries, each acted for their own or an affiliates' respective self interest and personal financial gain.

//

**Class Action Adversary Complaint**

142.    As a proximate result of DRA and Does 1-40's wrongful interference with the PMA, the TRUST and Beneficiaries has suffered and continues to suffer loss, injury and damage according to proof at trial.

143.    Defendants DRA and Does 1-40, and each of them, did the things alleged herein above intentionally, oppressively and maliciously, and the TRUST and Beneficiaries is thereby entitled to reasonable punitive or exemplary damages according to proof at trial.

## SEVENTH CAUSE OF ACTION

## INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

## Against DRA, DPR and Does 1-40

144.    Plaintiffs repeat and incorporate herein by reference the allegations in the preceding paragraphs inclusive of this Complaint as if set forth fully herein.

145.    This cause of action is asserted by Plaintiffs and the Class against DRA, DPR and Does 1-40.

146.    The TRUST and Beneficiaries as a 30.00% TIC interest owner of the Congress Center Property were involved in a valid and existing business relationship with the numerous tenants (collectively the "Tenants") of the Congress Center Property and 100% of the Western Place and Sutter Square Properties, in that the TRUST and Beneficiaries as landlord pursuant to leases with the Tenants had the expectation of an economic benefit, for continued receipt of rents and net operating income along with the continued debt service reduction creating equity as well as growth in rents and net operating income resulting in an increased value of the Congress Center Property all to be realized in the future.

147.    Defendants DRA, DPR and Does 1-40 knew of the relationship between The TRUST and Beneficiaries and the Tenants.

148.    Defendants DRA, DPR and Does 1-40 intentionally disrupted the relationship between the TRUST and Beneficiaries and Tenants by committing the above described wrongful acts, including without limitation, the use of Locoh and Mikles via DRA's NNNRI and DPR to recommend the sale of the Congress Center Property without disclosing the secret dual agency relationship and conflicts of interest in acting as agent for and on behalf of the Northwood and

41.

ARPT and ARP-OP joint venture, and later NWCCO, and against the interests the TRUST and Beneficiaries. Still further the wrongful and premature sales of the Western Place and Sutter Square Properties.

149.    As a result of Defendants DRA, DPR and Does 1-40's intentional acts, the business relationship between the TRUST and Beneficiaries and Tenants was disrupted in that the TRUST and Beneficiaries were induced to sell the Congress Center Property when if it/he/she/they had been told the truth Plaintiffs and the Class would never have sold.

150.    Defendants DRA, DPR and Does 1-40's interference with the business relationship between the TRUST and Beneficiaries and Tenants has resulted in damage to The TRUST and Beneficiaries according to proof at the time of trial.

151.    Defendants DRA, DPR and Does 1-40, and each of them, did the things alleged herein above intentionally, oppressively and maliciously, the TRUST and Beneficiaries are thereby entitled to reasonable punitive or exemplary damages according to proof at trial.

### EIGHTH CAUSE OF ACTION

### NEGLIGENCE

### Against all DRA, DPR and Does 1-40

152.    Plaintiffs repeat and incorporate herein by reference the allegations in the preceding paragraphs inclusive of this Complaint, excluding paragraphs contained in the Sixth, and Seventh Causes of Action, as if set forth fully herein.

153.    This cause of action is asserted by Plaintiffs and the class against all DRA, DPR and Does 1-40.

154.    The TRUST and Beneficiaries allege that Defendants DRA, DPR and Does 1-40's actions were negligent in acting in the manner above described causing loss, injury and damage to the TRUST and Beneficiaries, the Plaintiffs and the Class, in an amount to be determined according to proof at the time of trial.

### VII.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Class pray that the Court enter judgment in

42.

his/her/its/their favor as follows:

1. For certification of this case to be a class action.

2. For appointment of Plaintiff's counsel as class counsel.

3. On each of the Second, Third and Fourth Claims for Relief, for judgement against Debtors and DRA and/or DPR, determining that the debt owed by the Debtors to Plaintiffs and the Class is not dischargeable in its/their bankruptcy cases and for judgement thereon according to proof.

4. For compensatory damages according to proof.

5. For general damages according to proof.

6. For special damages according to proof.

7. For a constructive and resulting trust over real and personal property interests derivative of Plaintiffs and the Class' Beneficial Interests and funds.

8. For exemplary and punitive damages according to proof.

9. For attorneys fees pursuant to any applicable contracts.

10. For costs of suit incurred.

11. For statutory damages, if any.

12. For prejudgment and post judgment interest, according to law.

13. For such other and further relief as the court may deem just and proper.

DATED: March 4, 2019.                    CATANZARITE LAW CORPORATION


                              By:    ___/s/ Kenneth J. Catanzarite_____
                                     Kenneth J. Catanzarite
                                     Attorneys for Plaintiffs and the proposed Class

**Class Action Adversary Complaint**